VOSS INTERNATIONAL CORP.,
Appellant,

v.

The UNITED STATES, Appellee.

Appeal No. 79–26.

United States Court of Customs
and Patent Appeals.

Aug. 14, 1980.

Edward N. Glad, Los Angeles, Cal., for appellant.

Alice Daniel, Asst. Atty. Gen., Washington, D. C., for appellee; David M. Cohen, Director, Joseph I. Liebman, Atty. in Charge, Field Office for Customs Litigation, Susan C. Cassell, New York City, of counsel.

Before MARKEY, Chief Judge, RICH, BALDWIN and MILLER, Judges, and FRIEDMAN, Chief Judge.*

BALDWIN, Judge.

This appeal is from the judgment of the United States Customs Court, 78 Cust.Ct. 130, C.D. 4698, 432 F.Supp. 205 (1977) (hereinafter *Voss I*), granting appellee's motion for partial summary judgment, holding that a valid affirmative determination of injury to an industry in the United States was made in accordance with 19 U.S.C. § 160(a)[1] by the Tariff Commission (now the International Trade Commission, hereinafter referred to as "Commission"), and from the judgment of the Customs Court, 82 Cust.Ct. 190, C.D. 4801, 473 F.Supp. 327 (1979) (hereinafter *Voss II*), dismissing appellant's action challenging the amount of special dumping duties assessed. The appeal from both judgments challenges the legality of certain dumping duties assessed pursuant to the Antidumping Act of 1921, as amended, 19 U.S.C. § 160 et seq. We affirm the judgment of *Voss I*. We reverse and remand the judgment of *Voss II*.

## Issues

The first issue addressed is whether the Commission's determination of injury was a valid affirmative determination of injury in accordance with 19 U.S.C. § 160(a). The second issue is whether the purchase price paid by appellant (Voss) was definite and determinable prior to the date of exportation of the subject merchandise.

## Background

The subject merchandise consists of asbestos cement pipe (pipe) which was exported from Japan on February 13, 1972, and entered at the port of Los Angeles on March 17, 1972, under consumption entry No. 172391.

As contemplated by 19 U.S.C. § 160(a), the Commission conducted an investigation to determine whether the importation of the pipe was injuring an industry in the United States. The Commission made a determination of injury by an evenly divided vote of two commissioners for and two against with a fifth commissioner, who was present when the actual determination of injury was made, abstaining. The Commission has a membership of six commissioners.

The Secretary of the Treasury, accordingly, made a public finding of dumping in accordance with 19 U.S.C. § 160(a). The Customs Service then ascertained the foreign market value as defined in 19 U.S.C. § 164 and the purchase price as defined in 19 U.S.C. § 162,[2] and assessed special dump-

---

* The Honorable Daniel M. Friedman, United States Court of Claims, sitting by designation.

1. 19 U.S.C. § 160(a), in effect at the date of the transaction, provided:

   § 160. *Initiation of investigation; injury determination; findings; withholding appraisement; publication in Federal Register.*

   (a) Whenever the Secretary of the Treasury (hereinafter called the "Secretary") determines that a class or kind of foreign merchandise is being, or is likely to be, sold in the United States or elsewhere at less than its fair value, he shall so advise the United States Tariff Commission, and the said Commission shall determine within three months thereafter whether an industry in the United States is being or is likely to be injured, or is prevented from being established, by reason of the importation of such merchandise into the United States. The said Commission, after such investigation as it deems necessary, shall notify the Secretary of its determination, and, if that determination is in the af-

firmative, the Secretary shall make public a notice (hereinafter in sections 160–173 of this title called a "finding") of his determination and the determination of the said Commission. For the purposes of this subsection, *the said Commission shall be deemed to have made an affirmative determination if the Commissioners of the said Commission voting are evenly divided as to whether its determination should be in the affirmative or in the negative.* The Secretary's finding shall include a description of the class or kind of merchandise to which it applies in such detail as he shall deem necessary for the guidance of customs officers. [Emphasis ours.]

2. 19 U.S.C. § 162 provides in relevant part:

   § 162. *Purchase price.*

   For the purposes of this section and sections 160–171 of this title, the purchase price of imported merchandise shall be the price at which such merchandise has been purchased or agreed to be purchased, prior to the time of exportation, by the person by whom or for

ing duties in an amount equal to the difference, as required by 19 U.S.C. § 161.[3] The parties do not question the foreign market value ascertained by the Customs Service.

In assessing the special dumping duties, the Customs Service determined that the Japanese trading firm of Marubeni–Iida Co. Ltd. (Marubeni Japan) was the purchaser of the pipe and that its wholly owned subsidiary, Marubeni–Iida (America), Inc. (Marubeni America) was the person by whom or for whose account the merchandise was imported. Customs concluded that the price paid by Marubeni Japan to the Japanese manufacturer of the pipe, Kubota Iron & Machinery Works, Ltd. (Kubota) represented the "purchase price" as defined by 19 U.S.C. § 162.

### Purchase Price Agreements

Mr. Arthur A. Voss, the president of Voss, first approached Kubota in Japan in an effort to find a source for asbestos cement pipe. Kubota represented that it could produce such pipe to American standard specifications. These meetings culminated with an initial agreement on August 1, 1960, followed by subsequent agreements in 1966, 1968, and 1969, none of which are relevant to the present controversy.

The agreement of January 22, 1971, is directly relevant since the purchase orders for the entries in question were made subject to that agreement. This agreement was in the form of a letter from Marubeni Japan to Voss, confirmed by Voss and Kubota, and stated at the outset:

> We are pleased to confirm our agreement concerning our transaction of "KUBOTA" Asbestos Cement Pipe to be shipped

during 1971, reached among Kubota, Ltd. as manufacturer, Voss International Corp. as buyer and Marubeni–Iida Co., Ltd. as seller, in the discussion held by the above parties on January 21, 1971 at Tokyo on terms and conditions set forth hereunder.

The agreement then prescribes the specific dollar price for various diameters and classes of pipe, FAS Osaka; provides a quantity for 1971 of about 18,000 tons; and sets forth size and length specifications. The agreement provides terms and conditions for payment by Voss to Marubeni America. Further, it was agreed that Voss, Marubeni Japan, and Kubota would each contribute a certain sum for a sales promotion fund. A provision to provide for exchange fluctuation was included:

> The price payable by the Buyer to the Seller under this agreement shall be based upon present exchange parity rate of Japanese Yen Three Hundred Sixty to One U. S. Dollar. In case of any devaluation and/or revaluation of U. S. Dollar and/or Japanese Yen after the date of this agreement, the price shall be renegotiated among the concerned parties.

A letter dated September 7, 1971, from Marubeni America to Voss, and confirmed by Voss, provides a supplemental agreement with regard to the then existing floating or revaluation of Japanese yen. The agreement provided that the exchange loss due to yen fluctuation was for the buyer's account. Further, for each transaction the difference in exchange rates between the time of negotiation of the shipping documents and a specified time (exchange parity

---

whose account the merchandise is imported, plus [certain enumerated costs].

**3.** 19 U.S.C. § 161(a) provides:

§ 161. *Amount of duty to be collected; determination of foreign market value of goods.*
(a) In the case of all imported merchandise, whether dutiable or free of duty, of a class or kind as to which the Secretary of the Treasury has made public a finding as provided for in section 160 of this title, entered, or withdrawn from warehouse, for consumption, not more than one hundred and twenty days before the question of dumping was

raised by or presented to the Secretary or any person to whom authority under said section has been delegated, and as to which no appraisement report has been made before such finding has been so made public, if the purchase price or the exporter's sales price is less than the foreign market value (or, in the absence of such value, than the constructed value) there shall be levied, collected, and paid, in addition to any other duties imposed thereon by law, a special dumping duty in an amount equal to such difference.

rate, at that time, about Japanese yen 357 per U. S. dollar) would be borne by the buyer, i. e., Voss, and that this difference would be paid by Voss to Marubeni America in cash at the exchange rate of the negotiation immediately after Voss received the invoice. Finally, the agreement was to be applicable to all of the present outstanding balance of specifically listed contracts (which included the purchase orders here in issue).

Other facts of relevance in the case are these: The consumption entry prepared by Voss identified Voss as the importer of record and as the person for whose account the merchandise was imported. Voss paid the duties in question. However, the special Customs invoice filled out by Marubeni Japan identified Marubeni America as the "purchaser" of the merchandise. The packing list also filled out by Marubeni Japan identified Marubeni America as the party for whose account and risk the merchandise in question was sold. Voss paid for the imported pipe in question by check made out to Marubeni America.

### Customs Court Determinations

a) *Motion for partial summary judgment with regard to validity of Commission's determination of injury*

In *Voss I*, supra, Voss contended that the Commission's determination of injury was *ultra vires* and, therefore, invalid. Voss asserted that the Commission exceeded its statutory authority by entertaining the abstention of a member otherwise participating in order to achieve an affirmative determination when his vote would have materially affected the outcome of the proceedings. The Customs Court first remanded this case to the Commission for reconsideration of the determination of injury. The Commission chose to stand by its original vote and corresponding determination of injury. The Customs Court then ruled that a valid affirmative determination of injury pursuant to § 160(a) was reached by the Commission since two members voted affirmatively and two members voted negatively, and granted the Government's motion for partial summary judgment as to this issue.

b) *Trial on assessment of dumping duties*

A trial was held on Voss's second cause of action which challenged the amount of dumping duties assessed against the subject pipe. The Customs Court determined that the clear weight of the evidence before it established (1) that Kubota and Marubeni Japan entered into a sales contract for exportation of cement asbestos pipe to the United States, with Kubota having no direct transactions with either Marubeni America or Voss; (2) that a contract was concluded between Marubeni Japan and Voss for each calendar year; (3) that Kubota sold the subject merchandise to Marubeni Japan on the basis of FAS Osaka, and Marubeni Japan generally paid Kubota 80 percent of the purchase price within 20 days after the date of the sales contract and paid the balance of 20 percent within 2 weeks after shipping; (4) that Kubota and Marubeni Japan negotiated on a "principal to principal" basis; and (5) that Marubeni Japan sold the subject merchandise to Voss on a FAS Osaka basis. The court concluded that the Customs Service determination that Marubeni Japan was the purchaser of the pipe and that Marubeni America was the person by whom or for whose account the merchandise was imported was erroneous as a matter of law, and directly contrary to 19 U.S.C. § 162. The court ruled that the price that becomes the "purchase price" under 19 U.S.C. § 162 is the price at which the person by whom or for whose account the merchandise is imported agrees to purchase said merchandise. The court concluded that Marubeni Japan was the seller of the merchandise and that Voss was the person for whose account the merchandise was imported.

However, the court then considered whether or not Voss' price was a proper "purchase price" under 19 U.S.C. § 162 which provides that the purchase price "shall be the price at which such merchandise has been purchased or agreed to be purchased, *prior to the time of exporta-*

*tion*." (Emphasis ours.) The court held that at the time of the original agreement, January 22, 1971, and at the time of the supplemental agreement, September 7, 1971, it was impossible to know what effect, if any, currency fluctuations would have on the ultimate purchase price. At the time the pipe was exported, February 13, 1972, Voss did not know the exact amount it would have to pay. By the terms of the supplemental agreement, Voss did not know the exact price it would pay until the date of negotiation of the shipping documents, which in this case was February 18, 1972. The court ruled that this supplemental agreement regarding the loss due to currency fluctuation frustrates the intent of the Antidumping Act since it is an agreement to pay an amount to be determined after the date of exportation and thus may not form a basis for the determination of the "purchase price" as defined in 19 U.S.C. § 162. The court indicated that the Antidumping Act envisions that a definite and determinable purchase price (whether actual or agreed) must exist prior to the date of exportation for comparison with the foreign market value–this in order to determine the margin of dumping. Since the *exact* amount Voss would pay according to the agreements was not calculable until February 18, five days after the date of exportation, the court reasoned that this *exact* price was not the "purchase price" for purposes of 19 U.S.C. § 162, because it was not a price paid or agreed to be paid "prior to the date of exportation." Accordingly, the Customs Court dismissed the second cause of action, *Voss II*, supra.

## OPINION

a) *Validity of Commission's determination of injury*

■ A quorum of the members of the Commission can conduct the business of the Commission. In the absence of statutory restriction, a majority of a quorum is sufficient to make a valid determination for the Commission. *Frischer & Co. v. Bakelite Corp.*, 17 CCPA 494, 504, T.D. 43964, 39 F.2d 247, 255, *cert. denied*, 282 U.S. 852, 51

S.Ct. 29, 75 L.Ed. 755 (1930). *See also FTC v. Flotill Products, Inc.*, 389 U.S. 179, 88 S.Ct. 401, 19 L.Ed.2d 398 (1967). Congress has expressly provided in 19 U.S.C. § 1330(c) that a majority of the Commissioners in office shall constitute a quorum.

The general rule of *Frischer* is modified for the purposes of determination of injury in a dumping investigation by § 160(a). The statutory language of § 160(a) which provides for an affirmative determination "if the Commissioners of the said Commission voting are evenly divided" looks to the Commissioners who participate in the vote and not those who are present at the time the vote is taken.

By this language, we do not consider that Congress intended to compel a Commissioner present at a meeting to vote on every issue presented for determination. Abstention from voting is a legally permissible right often exercised by members of legislative and administrative bodies. *See*, e. g., *Greater Boston Television Corp. v. Federal Communications Commission*, 444 F.2d 841, 861 (D.C. Cir. 1970), *cert. denied*, 403 U.S. 923, 91 S.Ct. 2229, 29 L.Ed.2d 701 (1971). Also, we do not consider that the courts are compelled by this language to probe the mental processes of a hearing officer or to inquire into the manner and method of administrative consideration of evidence to discern the reasons for the abstaining vote, i. e., whether it was for "good cause." *United States v. Morgan*, 313 U.S. 409, 61 S.Ct. 999, 85 L.Ed. 1429 (1941).

In 1958, the Congress considered a bill (H.R. 6006) to amend certain provisions of the Antidumping Act of 1921. The Senate Finance Committee, in reporting the house—passed bill, proposed an amendment to the bill which further amended the law (§ 160(a)) to provide that "if there is an evenly divided vote within the Commission, then a finding of injury results." S.Rep.No. 1619, 85th Cong., 2d Sess., *reprinted in* [1958] U.S.Code Cong. & Admin. News, pp. 3498, 3499.

Senator Byrd of Virginia, the committee chairman, made the following comments relevant to Senate consideration of the proposed amendment:

If the Tariff Commission finds injury is threatened or is occurring, then the Secretary of the Treasury is to assess special dumping duties. There are six members on the Tariff Commission and equally divided votes are not uncommon. The committee amendment would provide that * * * if the members of the Commission voting were evenly divided on the question of injury, then a finding of injury would result. In other words, if there was sufficient evidence of injury to convince half the number of the commissioners voting, then the finding would be of injury and the Secretary of the Treasury would so recognize it. [104 Cong. Rec. 9456 (1958).]

Upon submitting the conference committee report for consideration, Senator Byrd remarked:

[T]his is a unanimous conference report. It is signed by the conferees of both the Senate and the House. The only change it makes in the bill is to provide that when the Tariff Commission renders an equal decision—3 one way and 3 the other way—it is affirmative with respect to injury. That is the only change which is made in the bill. [104 Cong.Rec. 15987 (1958).]

Although the latter statement seemingly indicates that Senator Byrd was concerned only with the situation where all six members of the Commission participated and they were equally divided—which is how Voss interprets the statute—the language Congress used was not so restrictive. To the contrary, as Senator Byrd stated in the preceding quotation (and as the statute provides), if "half the number of the commissioners voting" concluded that there was injury to competition, the equally–divided vote of the Commission would be deemed to constitute an affirmative determination of injury.

On the basis of the foregoing, we are satisfied that the legislative intent was to provide for an affirmative determination of injury if at least half the Commissioners voting were convinced of injury by the evidence presented, notwithstanding that the statutory language chosen provides an exception to the general rule of *Frischer* when the vote is evenly divided.

On April 20, 1972, when the Commission voted on the question of injury, four Commissioners actually participated in the determination by voting, two affirmatively and two negatively. A fifth member was present for the determination but abstained from voting. The four members were a majority of the Commissioners in office and thus constituted a quorum under 19 U.S.C. § 1330(c).

■ We hold, therefore, that a valid affirmative determination of injury for purposes of 19 U.S.C. § 160(a) was reached on April 20, 1972, by the Commission, since a legally constituted quorum of four members did participate in the determination of injury by voting, and there was an evenly divided vote.

Voss asserts that the Government, having prayed for and received an order based on a determination that the Commission's determination was invalid, is now precluded or estopped from arguing to the contrary. In so asserting, Voss interprets the action of the Customs Court in first remanding this case to the Commission for reconsideration of the determination of injury as a judgment by the court that the Commission's determination of injury was invalid. We consider this assertion of Voss without merit. The express terms of the order below, dated August 25, 1976, denied both Voss's motion for summary judgment and the Government's cross–motion for partial summary judgment, remanded the case to the Commission for reconsideration, and stayed the proceedings. The court's order neither expressly nor by implication decided the issue of the validity of the Commission's determination of injury.

b) *Assessment of dumping duties*

For purposes of this appeal, the parties do not question the Customs Court's determination that for purposes of assessing dumping duties for the transaction in issue, Marubeni Japan was the seller of the subject

merchandise and Voss was the person by whom or for whose account the merchandise was imported.[4]

In its supplemental brief, responding to a direct question from this court wherein we asked for the parties' views on the legal correctness of the Customs Court's determination, the Government does contend that, for purposes of assessing duties under the Antidumping Act, the seller of the merchandise was Kubota and the buyer was Marubeni Japan for the account of Marubeni America. In a footnote to its supplemental brief, the Government notes that "[i]n our brief before this Court, we did not assert this argument because the Customs Court decision could be supported on the grounds that the price to Voss was not a proper 'purchase price' under the statute."

Accordingly, the question presented for our determination is simply whether the purchase price paid by Voss was a "price at which such merchandise has been * * * agreed to be purchased, prior to the time of exportation" as provided for in § 162. The Government has conceded, for the purposes of this appeal, that the price which Marubeni Japan paid to the manufacturer Kubota is to be ignored in view of the Customs Court's determination of the transaction in issue, but now asserts that the price paid by Voss was not a proper purchase price under § 162, since the *exact* price was not known prior to exportation, and thus was not negotiated prior to exportation. The Government asserts that § 162 provides a specific Congressional mandate that the *exact* price must be known prior to exportation, but the statute does not so provide.

The Customs Court stated in its opinion:

At the outset, it is clear that the Antidumping Act envisions that a definite and determinable purchase price (whether actual or agreed) must exist prior to the date of exportation for comparison with the foreign market value–this in order to determine the margin of dumping. [*Voss II*, supra, 82 Cust.Ct. at ——, 473 F.Supp. at 332.]

While the court cites no support for this conclusion, for purposes of this appeal we accept this statement in view of the fact that appellant specifically accepted it in its brief.

The trial court went further, however, and reasoned that a definite and determinable price for purposes of § 162 must be an *exact* price known prior to the date of exportation. Since Voss did not know the exact amount in *U. S. dollars* it would have to pay for the merchandise until receipt of the shipping documents, in this case five days after the date of exportation, the court concluded that "the price which Voss paid or agreed to pay Marubeni was not the 'purchase price' for purposes of 19 U.S.C. § 162, because it was not a price paid or agreed to be paid *prior to the date of exportation*." (Emphasis in original.) *Voss II*, supra, 82 Cust.Ct. at ——, 473 F.Supp. at 333.

However, by the terms of the agreement of January 22, 1971, together with the supplemental agreement of September 7, 1971, there was nothing more the parties had to negotiate or agree to regarding the "price" that Voss would pay for the merchandise under § 162. (See the discussion of purchase price agreements supra.) The original agreement prescribed the specific dollar price for the merchandise and the

---

4. The following legislative history is relevant to the reasons for certain modifications to purchase price in § 772 of the Trade Agreements Act of 1979, Pub.L. No. 96–39, 93 Stat. 144:

The purpose of the substantive modification to purchase price is to establish in the statute present administrative practice. If a producer knew that the merchandise was intended for sale to an unrelated purchaser in the United States under terms of sale fixed on or before the date of importation, the producer's sale price to an unrelated middle-

man will be used as the purchase price. The dicta in *Voss International v. United States*, 473 F.Supp. 327, C.D. 4801 (May 7, 1979), which is inconsistent with this practice, is explicitly overruled. Thus, "purchase price" may be used if transactions between related parties indicate that the merchandise has been sold prior to importation to a U. S. buyer unrelated to the producer. [S.Rep. No. 96–249, 96th Cong., 1st Sess., 94, *reprinted in* [August 1979] U.S.Code Cong. & Admin. News, pp. 381, 480.]

then prevailing exchange rate. The supplemental agreement, entered into prior to the date of exportation, sets forth the clear intention of the parties that the buyer, Voss, would pay to Marubeni America a sufficient amount of U. S. dollars to provide for exchange loss due to yen fluctuation. An exchange parity rate *at a specified time* was agreed to by the parties, with any difference in exchange rates between that time and the time of negotiation of the shipping documents to be borne by Voss. The clear result is a definite and determinable price *in yen* irrevocably agreed to prior to the time of exportation. That Voss agreed to pay more or less dollars in accordance with exchange fluctuations does not change the price agreed to be paid to the Japanese vendor.

In response to a direct question by this court, wherein we asked the parties whether a price agreed to be paid would satisfy § 162 if that price were known and fixed in amount of yen to be received by the seller, the Government conceded that "[i]f a contract provided for a definite, determinable and exact price fixed in Japanese yen, not subject to any condition subsequent to exportation, that price would be a proper "purchase price" under § 162." However, the Government then contended that in this case the purchase price agreements were contracts payable in U. S. dollars and both were dependent for exactness in dollars upon a condition subsequent to exportation, and that neither agreement fixed a price in yen to be paid by Voss.

This response by the Government avoids the question whether the price paid by Voss was a definite and determinable price in yen prior to such time of exportation. The clear intention of the purchase price agreements was to establish with certainty the amount of yen to be received by the seller. Voss, in its memorandum response to our questions, points out that the agreement of January 22, 1971, requires only that the dollar amounts be multiplied by 360 to determine their yen equivalents. If the agreement of September 7, 1971, is to be considered an amendment to the annual contract, then it is only necessary that the dollar amounts be multiplied by the exchange rate at the specified time to determine their yen equivalents. The net effect of the subject purchase price agreements is that Voss agreed to pay a sufficient amount of *dollars* to yield an agreed upon amount of *yen.*

We hold, therefore, that the price paid by Voss, by virtue of the agreements in the record before us, was a definite and determinable price in yen agreed to prior to the time of exportation, and was a "price at which such merchandise has been * * * agreed to be purchased, prior to the time of exportation" as provided for in § 162. The court below erred in its conclusion to the contrary and in dismissing the action for that reason.

The Customs Service had assessed dumping duties on a transaction based on determinations by the Customs Service found by the Customs Court to be erroneous as a matter of law. As a result of the dismissal of the action, there has been no assessment of dumping duties on the transaction viewed by the Customs Court as the proper transaction. Accordingly, we remand to the Customs Court for consideration and determination of dumping duties to be assessed upon the proper transaction.

### Conclusion

We *affirm* the judgment of the Customs Court granting appellee's motion for partial summary judgment wherein the determination of injury by the Commission was deemed to constitute a valid affirmative determination pursuant to 19 U.S.C. § 160(a). We *reverse* the judgment of the Customs Court dismissing the second cause of action challenging the amount of dumping duties assessed by the Customs Service and *remand* to the Customs Court for further action consistent with this opinion.

MODIFIED AND REMANDED.

FRIEDMAN, Chief Judge,* dissenting in part, with whom MARKEY, Chief Judge, joins.

I agree with the court that the equally divided vote of the four voting members of the Tariff Commission constituted a valid affirmative determination of injury under section 160(a). I disagree, however, with the court's reversal of the Custom Court's ruling that there was no valid purchase price for purposes of section 162 and therefore also would affirm the Customs Court judgment in *Voss II.*

Section 162 defines the purchase price of imported merchandise, for the purpose of determining dumping duties, as "the price at which such merchandise has been . . agreed to be purchased, prior to the time of exportation, by the person by whom or for whose account the merchandise is imported . . . ." The court accepts the Customs Court's ruling that under this provision Voss was the importer and Marubeni Japan was the seller. Although the January 22, 1971 agreement between those companies established dollar prices for the imported merchandise, it further stated that the prices were based upon the then existing exchange rate between the dollar and the yen, and that if either currency were devalued and/or revalued, "the price shall be renegotiated among" the parties.

On September 7, 1971, Voss and Marubeni America made a supplemental agreement providing that Voss would bear any exchange loss due to yen fluctuation and that Voss would pay Marubeni America the differential "at the exchange rate . . . immediately after [Voss] receives the invoice" for the goods. Voss received the shipping documents covering the merchandise on February 18, 1972, 5 days after the goods had been exported. Since under the September 7, 1971 agreement Voss could not ascertain the price it would have to pay until February 18, 1972, the purchase price was not finally determined until the latter date. The price thus determined on February 18, 1972, was not "the price at which such merchandise . . . [was] agreed

to be purchased, prior to the time of exportation," as section 162 requires.

The Customs Court correctly explained why section 162 contains this requirement. As that court stated, ". . . the Antidumping Act envisions that a definite and determinable purchase price (whether actual or agreed) must exist prior to the date of exportation for comparison with the foreign market value—this in order to determine the margin of dumping."

The court's reasoning in concluding that this requirement of section 162 was here satisfied is as follows: Prior to exportation the parties had agreed upon a price in dollars based upon an exchange rate of 360 yen to the dollar, with the buyer to bear the risk of exchange loss due to yen fluctuation. Accordingly, "Voss agreed to pay a sufficient amount of *dollars* to yield an agreed—upon amount of *yen*." Thus, "the price paid by Voss, by virtue of the agreements in the record before us, was a definite and determinable price in yen agreed to prior to the time of exportation. . . ."

As the court recognizes, however, the contract price was in dollars, not in yen. As long as the number of yen the seller would receive, i. e., the price, would vary with any changes in the value of the yen in relation to the dollar, the purchase price was not set. Although the court states that there was "a definite and determinable price *in yen* irrevocably agreed to prior to the time of exportation," that statement is in error. If the value of the yen had decreased in relation to the dollar, Voss would have paid the dollar amounts specified in the contract, the agreement having specified that the purchaser, not the seller, bear losses due to yen fluctuation. If Voss paid in yen, a greater yen amount would have been required than that which would have been required at the time of the contract. Hence the price was not "fixed" in yen prior to exportation.

If the value of the yen had increased in relation to the dollar, Voss would have paid a greater dollar amount than that specified in the contract. If Voss paid in yen, the yen amount would have been that payable

---
* The Honorable Daniel M. Friedman, United States Court of Claims, sitting by designation.

at the time of the contract. Solely because the value of the yen did in fact increase, the majority applies that later development to the contract to find a price fixed therein in yen. The agreement, however, required payment in dollars, and the amount of that payment was not determinable until after exportation, i. e., the day the shipping documents were negotiated. Because under the agreement Voss was to bear only losses due to yen fluctuation, it would pay a larger dollar amount if the fluctuation went in one direction. It would pay the contract dollar amount if the fluctuation went in the opposite direction. In the former instance the dollar payment would be the equivalent of the same yen amount the seller would have received at the time of the contract. In the latter the dollar payment would have been the equivalent of a greater yen amount than the seller would have received at the time of the contract. The parties having specifically conditioned the price upon information unknown until after the time of exportation, there was no fixed price, in either yen or dollars, as required by section 162.

For these reasons I conclude that the Customs Court correctly held that the purchase price here had not been agreed upon prior to exportation and that section 162 therefore was not satisfied.