**FREEPORT MINERALS COMPANY (Freeport-McMoran Inc.), Plaintiff,**

v.

**UNITED STATES, Defendant,**

**Shell Canada Resources Limited and Canadian Superior Oil, Ltd., Intervenors.**

**Court No. 82–2–00247.**

United States Court of International Trade.

June 14, 1984.

Covington & Burling, Washington, D.C. (Harvey N. Applebaum and Richard E. Neff, Washington, D.C., on briefs), for plaintiff.

Richard K. Willard, Acting Asst. Atty. Gen., David M. Cohen, Director, Commercial Litigation Branch, Washington, D.C. (Sheila N. Ziff, Washington, D.C., on the brief), for defendant.

Arnold & Porter, Washington, D.C. (Patrick F.J. Macrory, Kenneth I. Juster, and Spencer S. Griffith, Washington, D.C., on brief) for intervenor Shell Canada Resources Ltd.

Shearman & Sterling, New York City (Donald L. Cuneo and David J. Mark, New York City, on brief), for intervenor Canadian Superior Oil, Ltd.

### Opinion and Order

MALETZ, Senior Judge:

On January 27, 1982, the International Trade Administration of the Department of Commerce (ITA) made a final determination pursuant to section 751 of the Trade Agreements Act of 1979, 19 U.S.C. § 1675 (1982), to revoke an antidumping finding as to two producers of elemental sulphur in Canada, Shell Canada Resources Limited (Shell) and Canadian Superior Oil, Ltd. (Canadian Superior). *See* 47 Fed.Reg. 3811 (1982). Plaintiff Freeport Minerals Company (Freeport), a domestic producer of elemental sulphur, challenges this determination via a motion for review under this court's rule 56.1. The government in turn has cross-moved for judgment affirming the ITA's determination.

Freeport contends that the administrative record demonstrates that the revocation determination of the ITA is contrary to law and that the findings upon which the determination was based are not supported by substantial evidence. More particularly, Freeport alleges that the ITA in its section 751 administrative review relating to Shell and Canadian Superior failed to: (1) collect and review sales data up to a time reasonably proximate to its 1982 revocation determination; (2) satisfy the requirement of finding that no sales were being made at less than fair value and that there was no likelihood of the resumption of sales at less than fair value; (3) apply the correct standard in the review process in that it improperly shifted the fact finding burden to Freeport; and (4) make proper dumping comparisons in reviewing a long term sales contract that Shell entered into in 1973 with a company in the United States. For the reasons that follow, the court denies Freeport's motion for rule 56.1 review and grants the government's cross-motion for judgment affirming the ITA's revocation determination.

### I. Background

On December 17, 1973, the Treasury Department—the predecessor to the present administering authority, the ITA—issued a finding of dumping under the Antidumping Act of 1921, as amended, 19 U.S.C. §§ 160 et seq. (1970), with respect to elemental sulphur sold by a number of Canadian man-

ufacturers including Shell and Canadian Superior. *See* 38 Fed.Reg. 34,655 (1973). On August 24, 1976, Canadian Superior requested the revocation of the dumping finding as to it, while Shell made a similar request on November 3, 1977.[1] As a result, on February 8, 1979, Treasury issued a tentative determination to modify or revoke the dumping finding as to Shell and Canadian Superior. *See* 44 Fed.Reg. 8057 (1979). This determination was based on the absence of sales at less than fair value by Shell and Canadian Superior for a period of two years, i.e., from January 1, 1975 through December 31, 1976. Treasury failed, however, to take final action on its tentative determination.

On January 1, 1980, the Trade Agreements Act of 1979 became effective and, among other things, repealed the Antidumping Act of 1921, *see* 93 Stat. 144 (1979), and prescribed new antidumping provisions. 19 U.S.C. §§ 1673 et seq. (1982). In addition, responsibility for administering the new antidumping law was transferred on January 2, 1980 from the Treasury to the Commerce Department. *See* Reorg.Plan No. 3 of 1979, 93 Stat. 1381, 5 U.S.C. app. at 1170 (1982). Soon after that, the International Trade Administration of the Department of Commerce started an administrative review of all outstanding dumping findings, as required by section 751 of the Trade Agreements Act. In reviewing the dumping finding on elemental sulphur from Canada, the ITA requested additional data from both Shell and Canadian Superior. Both companies complied and also agreed in writing to an immediate suspension of liquidation and reinstatement of the dumping finding if circumstances developed indicating that elemental sulphur produced by them was imported into the United States at less than fair value prices. *See* 46 Fed.Reg. 21,214, 21,215 (1981).

As a result of its administrative review, the ITA, on April 8, 1981, issued a tentative

determination to revoke the dumping finding against Shell and Canadian Superior, having found that (1) for the period from January 1, 1977 through February 8, 1979, Shell made no sales at less than fair value, with the exception of one sale that involved *de minimis* margins; (2) for the period from May 1, 1977 through February 8, 1979, Canadian Superior made no sales at less than fair value; and (3) "[t]here is no indication of any sales at less than fair value ... by these firms since ... [February 8, 1979]." *Id.*

Following this tentative revocation determination in April 1981, Freeport, pursuant to 19 U.S.C. § 1675(d) (1982), requested that the ITA conduct a full hearing. The ITA granted the request and held a hearing on October 19, 1981, at which Freeport appeared through counsel and Shell and Canadian Superior supplied additional information to both the ITA and Freeport.

After receipt of this information and the parties' briefs, the ITA made a final revocation determination on January 27, 1982. 47 Fed.Reg. 3811 (1982). The determination stated in part that the ITA "still finds that all sales by Shell Canada and Canadian Superior Oil were made at not less than fair value. *Id.* at 3812. The present motion for review and the government's cross-motion followed.

## II. Time Frame for Review Period

■ Freeport argues that the Commerce Department regulations require a showing of no sales at less than fair value for at least a two-year period of time reasonably proximate to the revocation. Thus, in Freeport's view, the minimum two-year period of administrative review should include all sales at least up to the date of the tentative revocation determination. Because the ITA used a more remote period of no sales at less than fair value as the time frame for its tentative revocation de-

---

**1.** Unlike the Trade Agreements Act of 1979, the 1921 Antidumping Act did not specifically provide for revocation of a dumping finding. However, Customs Regulations under the "old law" contained provisions for revocation. *See* 19 C.F.R. § 153.44 (1977).

termination,[2] Freeport insists that its determination is fatally flawed. The court cannot agree.

In the first place, there is no specific language in the statute or regulations to support Freeport's contention that the period of administrative review must include all sales up to the tentative revocation determination. On that question, the statute and regulations are silent. The only statutory provision at all relevant is 19 U.S.C. § 1675(c) (1982), which provides that the ITA "may revoke, in whole or in part, ... an antidumping order, ... after review under this section." And the only relevant Commerce Department regulation is section 353.54(a), which provides that "whenever the Secretary determines that sales of merchandise are no longer being made at less than fair value ... and is satisfied that there is no likelihood of resumption of sales at less than fair value, he may act to revoke or terminate ... such order or finding." 19 C.F.R. § 353.54(a) (1980). In order to do this, the regulation requires that the applicant for revocation provide "information demonstrating that the imported merchandise is not being sold at less than fair value," and that the applicant has "no sales at less than fair value for at least a two-year period *following* ... an Antidumping Duty Finding." *Id.* at § 353.54(b) (emphasis added).

In short, there is no statutory or regulatory requirement that the ITA base its decision to revoke on the most recent two-year period preceding a tentative revocation determination. And since "[t]he law is silent with respect to the prerequisite for a revocation ... the administering authority has broad discretion." Potts & Lyons, *The Trade Agreements Act: Administrative Policy and Practice in Antidumping Investigations*, 6 N.C.J. Int'l L. & Com.Reg. 483, 523 (1982). *See also Chevron Standard Ltd. v. United States*, 5 C.I.T. ——, ——, 563 F.Supp. 1381, 1385 (1983). Given the discretion thus accorded the ITA, defer-

ence is due its conclusion that under the statutory scheme a revocation determination need not necessarily be based on the two-year period immediately preceding the date of tentative revocation. *See Zenith Radio Corp. v. United States*, 437 U.S. 443, 450, 98 S.Ct. 2441, 2445, 57 L.Ed.2d 337 (1978) ("The administrative interpretation of a statute by the agency charged with its administration is entitled to deference."). *See also, e.g., Asahi Chem. Indus. Co. v. United States*, 4 C.I.T. 120, 123, 548 F.Supp. 1261, 1264 n. 2 (1982).

Moreover, although the ITA's tentative revocation determination of April 1981 was based on the absence of sales at less than fair value for time periods ending on February 8, 1979, the record here indicates a rational basis for the agency's reliance on those earlier periods and the consequent time lag. For one thing, the complexities of the administrative review process created a time lag between the date of the last sale analyzed for purposes of revocation and the actual notice of tentative revocation. This was particularly true in the present case, where the ITA had to analyze and review a large volume of data involving some fifty-two exporters. *See* 47 Fed. Reg. 3811, 3812 (1982). Compounding this problem was the ITA's large initial backlog of cases resulting from the transfer to it in January 1980 of antidumping administrative authority from the Treasury Department—a situation that exacerbated the inevitable delay in the determination of section 751 review and revocation cases. And there is the important added factor that at the hearing held by the ITA in October 1981 *updated* information was supplied by Shell and Canadian Superior that indicated an absence of sales at less than fair value.

Freeport nevertheless insists that the final ITA determinations in *Roller Chain, Other Than Bicycle, From Japan*, 48 Fed. Reg. 51,801 (1983), and *Steel Wire Strand for Distressed Concrete From Japan*, 48

---

**2.** As previously indicated, the ITA's tentative revocation determination of April 8, 1981 was based on findings of (1) no sales at less than fair value by Shell for the period from January 1, 1977 through February 8, 1979, and (2) no sales at less than fair value by Canadian Superior for the period from May 1, 1977 through February 8, 1979.

Fed.Reg. 45,586 (1983), demonstrate that the revocation determination in the present case violated "the ... [ITA's] well established policy to 'update' by means of a subsequent administrative review ... all sales through the date of its tentative revocation." The record here is clear, however, that the ITA did in fact review pertinent information not only up to but beyond the date of publication of its tentative revocation determination. For example, its April 8, 1981 tentative determination notice states that "[t]here is no indication of any sales at less than fair value by ... [Shell and Canadian Superior] since that time [i.e., February 8, 1979]." 46 Fed.Reg. at 21,215. In addition, before making its final determination in January 1982, the ITA considered the additional information supplied by Shell and Canadian Superior at the October 19, 1981 hearing that once again showed an absence of sales at less than fair value.

## III. Evidence of Less Than Fair Value Sales or the Likelihood of Resumption of Such Sales

### A. Sales at Less Than Fair Value

■ Freeport also argues that under the circumstances of this case there was a good cause for the ITA to require production of further data. It claims that data it submitted to the ITA showed that prevailing 1981 prices for sulphur in the Vancouver, British Columbia and Tampa, Florida markets reveal a significant probability of less than fair value selling. Among the data Freeport submitted was a statement of its market research manager comparing a market price in Tampa with a price in Vancouver, which comparison, according to Freeport, showed that the price in Vancouver was higher than the Tampa price. From this, Freeport argues that less than fair value sales must have taken place.

The ITA properly gave no weight to this comparison. The record shows that Vancouver is not a home market for Canadian sulphur, but rather is a port from which sulphur is exported. In this regard, the

Vancouver price quoted by Freeport is a price for export to *third* countries and not a home market price. But as to both Shell and Canadian Superior, the proper basis for a fair value comparison is *home market price* compared to United States price.[3] Accordingly, the price of Canadian sulphur for export to third countries through the Port of Vancouver is irrelevant.

■ Similarly unpersuasive is a second item in the record cited by Freeport. This consisted of *average* price statistics for 1981 published by the Alberta Resources Conservation Board, which indicate that "the price to customers in North America (U.S. and Canada combined)" was below the export price to third countries. However, as noted, the export price to third countries is irrelevant because the basis of comparison with United States price for both Shell and Canadian Superior is the Canadian home market price. Moreover, the price that Freeport suggests that the ITA should have used to compare with the third country export price is an average of United States and Canadian prices and thus is meaningless for purposes of making the comparison required by the statute.

■ Freeport also urges that because margins of sales at less than fair value were found in respect of *other* Canadian producers in a preliminary sulphur determination published on September 15, 1981, 46 Fed.Reg. 45,789, an inference can be drawn that Shell and Canadian Superior might also be selling at less than fair value. Accordingly, Freeport suggests that the ITA was obligated to investigate further. The inference that Freeport asks the court to draw simply does not withstand analysis. Many of those producers found to have had dumping margins during the period covered by the September 15, 1981 preliminary determination were also found to have had such margins during the periods when Shell and Canadian Superior were found *not* to be engaging in sales at less than fair value. 46 Fed.Reg. 21,214; *id.* at 45,689.

3. In 19 U.S.C. § 1677b(a)(1) (1982), Congress expressed preference for the use of home mar-

ket sales, as opposed to sales to third countries, as the basis for foreign market value.

Thus, the preliminary determination in question has no bearing in respect to either Shell or Canadian Superior.

### B. *Likelihood of Resumption of Sales at Less Than Fair Value*

■ Freeport next contends that the ITA violated its own policy in determining that there was no likelihood of resumption of sales at less than fair value. It relies on two ITA determinations—*Cadmium From Japan,* 46 Fed.Reg. 50,815 (1981), and *Canned Bartlett Pears From Australia,* 46 Fed.Reg. 43,224 (1981)—in which the agency reversed its tentative determinations to revoke dumping findings in view of the likelihood of resumption of sales at less than fair value. In both cases there had been no sales of the merchandise in question for a substantial period of time and the ITA, therefore, had no indication regarding the performance of these companies under an antidumping order. In both cases, also, the home market prices for the products in question were substantially higher than the United States market prices, so that if imports from those countries were to be resumed, there was the likelihood that they would be sold at less than fair value.

Here, not only have Shell and Canadian Superior continued to ship sulphur to the United States since the initial dumping finding, such shipments have been consistently at or above fair value. Moreover, both Shell and Canadian Superior have given specific assurances that they would exercise their best efforts to make no sales at less than fair value. These assurances have never been withdrawn and the ITA was entitled to rely upon them.

### IV. *Alleged Shifting of Fact Finding Burden*

■ Freeport further complains that the ITA "attempted to shift the burden of proving conclusively that Shell and Canadian Superior continued to make sales at less than fair value squarely upon Freeport." It bottoms this conclusion on the ITA's failure to send administrative review questionnaires to Shell and Canadian Superior for the two-year period immediately prior to the tentative revocation determination of April 1981. The ITA's failure to do so, it says, has the effect of placing a burden upon the domestic party opposing revocation to submit substantial evidence proving that Shell and Canadian Superior continued to make sales at less than fair value.

The argument is misdirected. Freeport overlooks what is required of the ITA in a section 751 administrative review proceeding when a finding of no sales at less than fair value is arrived at and no evidence to the contrary is presented. The ITA's finding of no sales at less than fair value is based, as previously indicated, upon substantial evidence in the administrative record.

In effect, Freeport's complaint is that the ITA failed to seek out information refuting its own findings of no sales at less than fair value—a burden patently not imposed by the statute. The provisions cited by Freeport to support this contention, 19 U.S.C. §§ 1673, 1673a, and 1673e (1982), deal with an entirely different situation, i.e., the obligation of the ITA to *initiate* an investigation upon presentation of minimal information indicating only the possible existence of sales at less than fair value. Thus, the threshold of evidentiary information required to initiate an investigation may be very low, depending upon the ability of the complaining party to gather information. That requirement stands in contrast to the circumstances of a section 751 review proceeding in which substantial evidence has already been furnished and is the basis for a finding of no sales at less than fair value. In other words, in light of an administrative record that shows no sales at less than fair value for a substantial period of time, the ITA properly presumed that there were no continuing sales at less than fair value. Given that situation, the ITA acted correctly in requesting Freeport to offer some support for its charges of sales at less than fair value when all the

evidence before the agency pointed to the contrary conclusion.[4]

### V.  Shell's 1973 Contract

■ On April 10, 1973, Shell entered into a five-year contract to sell sulphur to a United States purchaser at specific prices. The contract was entered into after Treasury's initiation of the fair value investigation and before the preliminary determination of sales at less than fair value of elemental sulphur.  In the event dumping duties were assessed, the agreement provided that the purchaser—who was contractually responsible for payment of those duties—could cancel the contract.[5]

Freeport maintains that the contract was not valid, because it was not a firm, fixed price contract.  The court concludes to the contrary that it was valid since it contained a "definite and determinable purchase price ... prior to the date of exportation for comparison with the foreign market value." *Voss Int'l Corp. v. United States*, 82 Cust.Ct. 190, 195, C.D. 4801 (1979), *modified and remanded*, 67 CCPA 96, C.A.D. 1253, 628 F.2d 1328 (1980).  Indeed, the ITA later verified that the prices under the contract had not varied.

Freeport next contends that the ITA should have compared the prices of shipments made under the Shell 1973 long term contract with Canadian home market prices during the review period, rather than with the home market price at the time the contract was executed.  But this position is inconsistent with the express language of the antidumping statute.  19 U.S.C. § 1677b (1982) establishes the general rule that foreign market value should be ascertained as of the time of exportation to the United States.  However, the statute goes on to provide an exception to this general rule.  This exception specifies that "in the case of merchandise purchased or agreed to be purchased ... *prior to the time of importation*, the foreign market value shall be ascertained *as of the date of such purchase or agreement to purchase.*"  *Id.* § 1677b(a) (emphasis added).

The exception recognizes that there is often a delay between sales and export.  Congress was aware that it would be unfair to compare the export price with the foreign market price when the latter price may well vary over time.  *See* Hearings on H.R. 2435 Before the Senate Committee on Finance, 67th Cong., 1st Sess., at 42 (1921).[6]

Further, it has been the consistent practice of the ITA to apply this interpretation and compare export prices under a long term contract with foreign market prices as of the date the agreement was entered into.  *See, e.g., Portable Electric Typewriters from Japan,* 48 Fed.Reg. 40,761 (1981); *Elemental Sulphur from Canada,* 47 Fed. Reg. 14,057 (1982).[7]

---

**4.**  Freeport objects also to the ITA's refusal to grant it access to data examined by the Treasury Department in its earlier investigation, claiming that the ITA in fact relied on these data in reaching its own decision.  This argument ignores the fact that the data in question were irrelevant to the ITA's own investigation, which fully satisfied the requirements of the Commerce Department regulations.  *See* 19 C.F.R. § 353.54(a) (1980).

**5.**  Since the latter period of the contract overlapped a portion of the ITA review period (January 1, 1977 to February 8, 1979), the ITA was obligated to make dumping evaluations as to sales under that contract as well as to other sales made within that period.

**6.**  Freeport argues that the ITA should have compared the export price to the United States with equivalent long term contracts in Canada or third countries.  No support is cited for this argument, which runs contrary to the statutes, regulations, and ITA policy.  The contract was entered into as of April 10, 1973.  The issue for antidumping comparisons is the home market value as of that date.  That figure was easily verifiable and there was no need to resort to speculative determinations as to which other long term contracts are similar or comparable to the one at issue.  Nonetheless, the ITA did compare the 1973 long term contract with the most recent Shell long term contracts in force on that date.  Thus, the ITA utilized the very procedure that Freeport argues it should have.

**7.**  Cases under the Robinson-Patman Act support this interpretation.  It has been held on facts analogous to those presented here that price discrimination cannot be established by comparing the price of sulphur shipped under a fixed price contract with prices under more

Finally, Freeport asserts that it was improperly denied a hearing with respect to this long term contract. The background is this. In response to questions raised by Freeport at the October 19, 1981 hearing, the ITA released to it under protective order data showing that all shipments made by Shell under the long term contract were at above fair value prices. Freeport then submitted a list of issues that it alleged the data raised and requested a hearing on those issues. Shell then submitted additional data in response to Freeport's concerns. The ITA responded by letter in January 1982 to each of the issues raised by Freeport and denied its request for a hearing. Freeport was given ample opportunity to comment in writing upon these issues.

The law does not require that Freeport be granted multiple hearings. The Act requires only that the ITA hold "a hearing" upon the request of any interested party. 19 U.S.C. § 1675 (1982). Here the ITA held a full hearing before reaching its final decision, and fully considered and responded to each of Freeport's concerns after the hearing was over. Congress could not have intended that a hearing be provided for every request of a petitioner. Otherwise, proceedings could be delayed indefinitely. Freeport was given ample opportunity to raise its concerns and the ITA responded in full. A new hearing was not necessary.

### Conclusion

For the foregoing reasons, Freeport's motion for review is denied and the government's cross-motion for judgment affirming the ITA's revocation determination is granted.

---

recently negotiated contracts. *Texas Gulf Sulphur Co. v. J.R. Simplot Co.*, 418 F.2d 793 (9th Cir.1969). The court there stated that fixed price contracts providing "[p]rice protection against market upswings are commonplace in

the American industrial scene," *id.* at 805, and that "[t]he validity of price protection provisions for the purpose of the Robinson-Patman Act must be evaluated *at the time the contract is made.*" *Id.* at 806 (emphasis added).