CORUS GROUP PLC, Corus UK Ltd, Corus Staal BV, Corus Packaging Plus Norway AS, Corus Steel USA Inc., and Corus America Inc., Plaintiffs–Appellants,

v.

INTERNATIONAL TRADE COMMISSION, Defendant–Appellee,

and

George W. Bush, President of the United States, and Robert C. Bonner, Commissioner, United States Customs Service, Defendants–Appellees,

and

Weirton Steel Corporation, Defendant–Appellee,

and

Bethlehem Steel Corporation, National Steel Corporation, and United States Steel Corporation, Defendants.

No. 03–1040.

United States Court of Appeals, Federal Circuit.

DECIDED: Dec. 11, 2003.

Richard O. Cunningham, Steptoe & Johnson, LLP, of Washington, DC, argued for plaintiffs–appellants. With him on the brief were Peter Lichtenbaum and Troy H. Cribb.

Mary Elizabeth Jones, Attorney, Office of the General Counsel, United States International Trade Commission, of Washington, DC, argued for Defendant–Appellee United States International Trade Commission. With her on the brief were Lyn M. Schlitt, General Counsel; and James M. Lyons, Deputy General Counsel.

Lucius B. Lau, Assistant Director, Commercial Litigation Branch, Civil Division, United States Department of Justice, of Washington, DC, argued for Defendants–Appellees, George W. Bush, President of the United States, and Robert C. Bonner, Commissioner, United States Customs Service. With him on the brief was David M. Cohen. Stephen C. Tosini, Attorney, for defendants-appellees. Of counsel was Jeanne E. Davidson, Deputy Director.

Roger B. Schagrin, Schagrin Associates, of Washington, DC, argued for Defendant–Appellee Weirton Steel Corporation.

Before NEWMAN, GAJARSA, and DYK, Circuit Judges.

Opinion for the court filed by Circuit Judge DYK. Opinion concurring in the judgment, dissenting in part filed by Circuit Judge NEWMAN.

DYK, Circuit Judge.

Corus Group PLC, Corus UK Ltd., Corus Staal BV, Corus Packaging Plus Norway AS, Corus Steel USA, and Corus America, Inc. ("the appellants"), appeal the decision of the United States Court of International Trade granting summary judgment for the government and dismissing the appellants' challenge to the President's imposition of an *ad valorem* duty on imported tin mill products. *Corus Group PLC v. Bush,* 217 F.Supp.2d 1347, 1359 (Ct. Int'l Trade 2002); *Corus Group PLC v. Bush,* No. 02–00253 2002 WL 31008986 (Ct. Int'l Trade Sept. 5, 2002) ("Judgment"). The appellants named as defendants in this case are George W. Bush, President of the United States, Robert C. Bonner, Commissioner of the United States Customs Service (now the United States Bureau of Customs and Border Patrol), and the United States International Trade Commission (collectively, "the government").[1]

The appellants argue that the President acted beyond his delegated authority because the International Trade Commission ("the Commission") was not evenly divided and thus could not trigger the President's authority to impose the duty under the Trade Act of 1974, 19 U.S.C. §§ 2101–2495 (2000), and that the three-member plurality did not, in any event, sufficiently explain its decision as required by the statute, 19 U.S.C. § 2252(f)(1) (2000). We hold that: 1) the Court of International Trade had jurisdiction over the case, and the appellants had standing; 2) the President should have been dismissed as a party

because 28 U.S.C. § 1581(i) does not authorize actions against the President; 3) the Commission determination was a tie vote; and 4) the plurality of commissioners, finding serious injury to the tin mill domestic market, adequately explained their determinations. Accordingly, we dismiss the appeal with respect to the President and affirm the judgment of the Court of International Trade in all other respects.

## BACKGROUND

### I

The Trade Act of 1974 grants the President broad powers to enter into trade agreements with foreign countries and to either decrease or increase duties on imported articles as required to carry out any such trade agreement. 19 U.S.C. § 2111 (2000). The Act includes an "escape clause" provision, which allows the President to provide "temporary relief" to domestic industries from the lowering of trade barriers as the result of such trade agreements, "so that the industry will have sufficient time to adjust to the freer international competition." S.Rep. No. 93–1298, at 119 (1974); 19 U.S.C. § 2251 (2000); *see generally* Peter Buck Feller, *U.S. Customs and International Trade Guide* §§ 22.00, 22.01 (2d ed. 2003). Under the escape clause provision, on petition, the Commission is directed to "make an investigation to determine whether an article is being imported into the United States in such increased quantities as to be a substantial cause of serious injury, or the threat thereof, to the domestic industry." 19 U.S.C. § 2252(b)(1)(A) (2000). If the Commission makes an affirmative injury determination, the President is directed to

1. Weirton Steel Corp., Bethlehem Steel Corp., National Steel Corp., and United States Steel Corp. intervened as defendants in the action.

"take all appropriate and feasible action within his power which the President determines will facilitate efforts by the domestic industry to make a positive adjustment to import competition and provide greater economic and social benefits than costs." *Id.* § 2251(a).

Although the President may not take action unless the Commission makes an affirmative injury determination, once such a determination is made, the President has broad latitude to determine the type of action to take. The Act provides an expansive, non-exclusive list of actions the President may take, including "any ... action which may be taken by the President under the authority of law and which the President considers appropriate and feasible." *Id.* § 2253(a)(3)(I).[2] The recommendation and report of the Commission is only one factor the President must consider in determining what action to take. *Id.* § 2253. Among the actions the President may take is "the imposition of, any duty on the imported article." *Id.* § 2253(a)(3)(A).

The Commission is composed of six commissioners who vote on the injury determination question. In the event that "the commissioners voting are equally divided with respect to [an injury] determination, then the determination agreed upon by either group of commissioners may be considered by the President as the determination of the Commission." *Id.* § 1330(d). The Act requires the Commission, upon reaching a determination, to submit a report to the President that provides "an explanation of the basis for the determination." *Id.* § 2252(f)(2)(A).

## II

On June 22, 2001, the United States Trade Representative made a request under 19 U.S.C. § 2252(b)(1)(A) that the Commission conduct an investigation to determine whether various steel products were being imported into the United States in such increased quantities as to be a substantial cause of serious injury to the domestic steel industry. Steel, USITC Pub. 3479, Inv. No. 201–TA–73, slip op. at 28 (Dec. 2001) ("Determination"). On July 26, 2001, the Senate Finance Committee requested an investigation as to the same question. *Id.*

---

**2.** The statute provides the following non-exclusive list of actions the President may take:

The President may, for purposes of taking action under paragraph (1)—

(A) proclaim an increase in, or the imposition of, any duty on the imported article;

(B) proclaim a tariff-rate quota on the article;

(C) proclaim a modification or imposition of any quantitative restriction on the importation of the article into the United States;

(D) implement one or more appropriate adjustment measures, including the provision of trade adjustment assistance under part 2 of this subchapter;

(E) negotiate, conclude, and carry out agreements with foreign countries limiting the export from foreign countries and the import into the United States of such article;

(F) proclaim procedures necessary to allocate among importers by the auction of import licenses quantities of the article that are permitted to be imported into the United States;

(G) initiate international negotiations to address the underlying cause of the increase in imports of the article or otherwise to alleviate the injury or threat thereof;

(H) submit to Congress legislative proposals to facilitate the efforts of the domestic industry to make a positive adjustment to import competition;

(I) take any other action which may be taken by the President under the authority of law and which the President considers appropriate and feasible for purposes of paragraph (1); and

(J) take any combination of actions listed in subparagraphs (A) through (I).

19 U.S.C. § 2253(a)(3) (2000).

All six commissioners then composing the Commission, including Commissioners Bragg, Devaney, Hillman, Koplan, Miller, and Okun, participated in the subsequent investigation. According to the Commission, the first step in an injury investigation is to "define[ ] 'the domestic industry producing an article that is like or directly competitive with the imported article.'" *Id.*, slip op. at 29 (quoting 19 U.S.C. § 2252(b)(1)(A) (2000)). Relevant to this appeal, a majority of four commissioners, Commissioners Hillman, Koplan, Miller, and Okun, determined that tin mill products should be analyzed separately from other carbon and alloy products, based on tin's distinct manufacturing processes and producers. *Id.*, slip op. at 48–49. Specifically, the majority defined one market comprising "slab, hot-rolled steel, plate, cold-rolled steel, and coated steel," which it called "certain carbon flat-rolled steel," and a separate market comprising tin mill steel. *Id.*, slip op. at 36. This same majority determined that the increase in importation of "certain carbon flat-rolled steel" (excluding tin mill) caused serious injury to the domestic market. *Id.*, slip op. at 50.

Of the four commissioners who defined "certain carbon flat-rolled steel" as a separate category from tin mill steel, three commissioners (Koplan, Okun, and Hillman) determined that the increase in imports of tin mill products did not cause serious injury to the domestic tin mill industry. *Id.*, slip op. at 74.

Commissioner Miller agreed with Commissioners Koplan, Okun, and Hillman that tin mill products should be analyzed as a separate category, but disagreed with those commissioners' negative injury determination as to tin mill products standing alone. Commissioner Miller found "that increased imports of tin mill products are a substantial cause of serious injury to the domestic tin mill industry." *Id.*, slip op. at 307.

Commissioners Bragg and Devaney, rather than analyzing tin mill products separately, each determined that all carbon and alloy flat products (including tin mill products) should be analyzed together as a single category. *Id.*, slip op. at 272–73. Based on this approach, Commissioners Bragg and Devaney each made an affirmative determination that increased importation of carbon and alloy flat products was a substantial cause of serious injury to domestic industry. *Id.*, slip op. at 282, 311. Commissioner Devaney, in footnotes throughout the majority opinion, joined the majority's conclusion that the importation of "certain carbon flat-rolled steel" (excluding tin mill) caused serious injury. *See, e.g., id.*, slip op. at 50 n. 186. Neither Commissioner Bragg nor Devaney, however, joined the majority's reasoning as to tin mill products.

Despite Commissioners Bragg and Devaney's broader definition of the relevant domestic industry as encompassing all carbon and alloy flat products including tin mill products, they both voted affirmatively at the public hearing announcing the determination of the Commission on October 22, 2001, that there was serious injury to the domestic industry, defined as covering the smaller category of tin mill products, as well as to the broader market, defined as carbon and alloy flat products. Commissioner Miller also voted affirmatively as to tin mill products as well as to the broader category of carbon and alloy flat products. The Commission reported that it was evenly divided as to whether increased importation of tin mill products caused serious injury. The Commission found:

Chairman Koplan, Vice Chairman Okun, and Commissioner Hillman determine that carbon and alloy tin mill products are not being imported into the United States in such increased quantities as to be a substantial cause of serious injury

to the domestic industry; Commissioners Bragg, Miller, and Devaney make an affirmative determination regarding imports of carbon and alloy tin mill products.

*Id.,* slip op. at 25.

On March 5, 2002, the President issued the "Steel Products Proclamation," whereby he took action under 19 U.S.C. § 2253, "To Facilitate Positive Adjustment to Competition From Imports of Certain Steel Products." Proclamation No. 7529, 3 C.F.R. 15 (2003). With regard to tin mill products, the President first noted that the "commissioners were equally divided with respect to the [injury] determination . . . regarding . . . carbon and alloy tin mill products." *Id.* at 15–16. Relying on his authority under 19 U.S.C. § 1330(d)(1) to treat the determination agreed upon by either group of evenly divided commissioners as the determination of the Commission, the President "decided to consider the determinations of the groups of commissioners voting in the affirmative with regard to [tin mill] products to be the determination of the [Commission]." *Id.* at 16. The President then imposed a duty on "certain flat steel" entering the United States, including tin mill products, "for a period of 3 years plus 1 day, with annual reductions in the rates of duty in the second and third years." *Id.* at 18. The duties for flat-rolled products, including tin mill products, were as follows: 30%, "[i]f entered during the period from March 20, 2002, through March 19, 2003, inclusive"; 24%, "if entered during the period from March 20, 2003, through March 19, 2004, inclusive"; and 18%, "[i]f entered during the period from March 20, 2004, through March 20, 2005, inclusive." Proclamation

No. 7529 Annex, 3 C.F.R. 21, 51 (2002). In imposing duties, the President did not treat tin mill products differently than the broader category of carbon and alloy flat products.

On March 22, 2002, the appellants filed suit in the Court of International Trade challenging the validity of the duty imposed on tin mill products. Pertinent to this appeal, the appellants contended "that the [Commission] votes supporting an affirmative injury determination were improperly counted [as a tie] with respect to tin mill products," *Corus Group,* 217 F.Supp.2d at 1350, such that the President did not have authority under section 2253(1)(A) to impose a duty on such products. The appellants also complained that Commissioners Bragg and Devaney "offered no injury or causation analysis specific to tin mill." Compl. ¶ 9.[3]

On August 9, 2002, the court granted the government summary judgment as to these issues. *Corus Group,* 217 F.Supp.2d at 1359. The court applied the standard of review announced by this court in *Maple Leaf Fish Co. v. United States,* 762 F.2d 86 (Fed.Cir.1985), for reviewing determinations by the President and the Commission under the escape clause provision of the Trade Act of 1974. In that case, we decided that "[f]or a court to interpose, there has to be a clear misconstruction of the governing statute, a significant procedural violation, or action outside delegated authority." *Corus Group,* 217 F.Supp.2d at 1352 (citing *Maple Leaf,* 762 F.2d at 89). Applying that standard, the Court of International Trade held that because "[t]here is no statutory or regulatory provision enumerating how the Commission

---

**3.** In their complaint, the appellants raised two other grounds for disputing the duty (both challenging the validity of Commissioner Devaney's appointment to the Commission) that they do not raise on appeal. The Court of International Trade granted the government summary judgment on these counts when it entered final judgment for the government on September 5, 2002. *Judgment.*

should count its vote ... [t]he court, therefore, cannot find that there has been a clear misconstruction of the statute or a significant procedural violation." *Id.* at 1353.

The court also held that Commissioners Devaney and Bragg offered an adequate explanation of their affirmative votes with regard to tin-mill products. The court determined that "it is clear that [Commissioners Devaney and Bragg] considered tin mill products in their analysis." *Id.* The court also relied on the fact that in the analyses of both Commissioners Bragg and Devaney, "these [tin mill] products are included in the larger category of carbon and alloy flat products." *Id.* According to the court, "Commissioner Devaney expressly stated that his findings should be applied to the more narrow categories determined by the majority" in footnotes to the Commission decision. *Id.* (citing Determination, slip op. at 52 n. 186, 58 n. 224). The court therefore granted the government summary judgment that the Commission vote was a tie vote and that Commissioners Bragg and Devaney had adequately explained their determinations. *Id.* at 1359. By the same order, the court also denied the appellants a preliminary injunction to enjoin enforcement of the duty increase on tin mill products and to prevent liquidation of tin mill entries. *Id.*

The court granted the government summary judgment on the appellants' remaining claims, which are not on appeal, and entered final judgment in favor of the government on September 5, 2002. *Judgment.* The appellants timely filed this appeal.[4]

4. The President's recent rescission of the Steel Products Proclamation on December 5, 2003, did not moot this case because the rescission was made explicitly prospective. Proclamation No. 7741, 68 Fed. Reg. 68481–84 (Dec. 8, 2003) ("The modifications to the

## DISCUSSION

### I

■ Although neither party contests the jurisdiction of the Court of International Trade in this case, we are nonetheless obligated to consider whether that court had jurisdiction and whether the appellants have standing. "[E]very federal appellate court has a special obligation to 'satisfy itself not only of its own jurisdiction, but also that of the lower courts in a cause under review,' even though the parties are prepared to concede it." *Bender v. Williamsport Area Sch. Dist.,* 475 U.S. 534, 541, 106 S.Ct. 1326, 89 L.Ed.2d 501 (1986) (quoting *Mitchell v. Maurer,* 293 U.S. 237, 244, 55 S.Ct. 162, 79 L.Ed. 338 (1934)). "[S]ince the question of standing goes to this [c]ourt's jurisdiction ... we must decide the issue even though the court below passed over it without comment." *Jenkins v. McKeithen,* 395 U.S. 411, 421, 89 S.Ct. 1843, 23 L.Ed.2d 404 (1969); *see also Info. Tech. & Applications Corp. v. United States,* 316 F.3d 1312, 1319 (Fed.Cir.2003).

■ The appellants suggest that the court had statutory jurisdiction here pursuant to 28 U.S.C. § 1581(i). That subsection provides, in relevant part, as follows:

[T]he Court of International Trade shall have exclusive jurisdiction of any civil action commenced against the United States, its agencies, or its officers, that arises out of any law of the United States providing for—

\* \* \*

(2) tariffs, duties, fees, or other taxes on the importation of merchandise for

HTS [Harmonized Tariff Schedule of the United States] made by this proclamation shall be effective with respect to goods entered, or withdrawn from warehouse for consumption, on or after 12:01 a.m., eastern standard time, December 5, 2003").

reasons other than the raising of revenue....

28 U.S.C. § 1581(i) (2000). Because no other statute specifically vests the court with jurisdiction over duties imposed pursuant to the escape clause provision and because there is no other statute precluding the court's jurisdiction in this case, section 1581(i)(2) vested the court with statutory jurisdiction over this case.

■ There is, however, another jurisdictional issue that we must examine. Appellants here seek review of the Commission's decision certifying that it had reached a divided vote with respect to tin mill products and of the President's action in relying on that vote to impose a duty under 19 U.S.C. § 2253. The discretionary nature of the President's action raises a question as to whether either of these actions is amenable to judicial review, an issue not previously addressed in *Maple Leaf*, which predated the pertinent Supreme Court decisions.

■ The Supreme Court has established that where the President has complete discretion whether to take an action in the first place, courts are without authority to review the validity of an agency recommendation to the President regarding such action. *Dalton v. Specter*, 511 U.S. 462, 469–70, 114 S.Ct. 1719, 128 L.Ed.2d 497 (1994) (holding that a report to the President by the Defense Base Closure and Realignment Commission was not subject to judicial review because it merely recommended base closures, and the President had "discretion to approve or disapprove the Commission's report"); *Franklin v. Massachusetts*, 505 U.S. 788, 797–99, 112 S.Ct. 2767, 120 L.Ed.2d 636 (1992) (holding that the decennial census report was not subject to judicial review, because it carried "no direct consequences for the reapportionment," and the President was "not expressly required to adhere to the

policy decisions reflected in the Secretary's report").

■ However, under the Supreme Court's cases, an agency recommendation is subject to judicial review if "the action . . . mark[s] the consummation of the agency's decisionmaking process," and "the action [is] one by which rights or obligations have been determined, or from which legal consequences will flow." *Bennett v. Spear*, 520 U.S. 154, 177–78, 117 S.Ct. 1154, 137 L.Ed.2d 281 (1997) (citations omitted). In *Bennett*, the issue was whether the district court had jurisdiction to review a Biological Opinion of the Fish and Wildlife Service, advising the Bureau of Reclamation as to how the Bureau's proposed action would affect endangered species or habitats. *Id.* at 158, 117 S.Ct. 1154. Because the Bureau of Reclamation was authorized to take action only if it complied with the terms and conditions specified in the Biological Opinion, it "alter[ed] the legal regime to which the action agency [was] subject." *Id.* at 178, 117 S.Ct. 1154. The Court held that the Biological Opinion was subject to judicial review and distinguished *Dalton* and *Franklin*. The Court concluded, "[u]nlike the reports in *Franklin* and *Dalton*, which were purely advisory and in no way affected the legal rights of the relevant actors, the Biological Opinion at issue here has direct and appreciable legal consequences." *Id.*

The cases establishing these principles have arisen under the Administrative Procedure Act ("APA"), which has a strict finality requirement, 5 U.S.C. § 704 (2000), but we think that doctrine is equally applicable where, as here, the review occurs under 28 U.S.C. § 1581, which may have a less strict requirement for final agency action. *See Nippon Steel Corp. v. United States*, 219 F.3d 1348, 1353 (Fed.Cir.2000) (stating that the Court of International Trade "ordinarily should not interfere with

an agency until it has completed its action, or else has clearly exceeded its jurisdiction" (citation omitted)). We conclude also that this case is controlled by *Bennett,* rather than by *Dalton* and *Franklin,* because the President does not have complete discretion under the statute, and the Commission's report had "direct and appreciable legal consequences." *Id.* The statute only gives the President authority to impose a duty if the Commission makes "an affirmative finding regarding serious injury." 19 U.S.C. § 2253(a)(1)(A) (2000). Therefore, the President's action was lawful only if the Commission was evenly divided. If the Commission's determination was negative, as the appellants claim, then the President acted beyond his delegated authority, and a judgment for the appellants in this case would in part invalidate the President's proclamation. Therefore, the President's action was not discretionary, and the validity of the proclamation is dependent on whether three commissioners in fact found serious injury with respect to tin mill products. Under *Bennett,* we therefore conclude that the action of the Commission is reviewable. 520 U.S. at 178, 117 S.Ct. 1154; *see also Chamber of Commerce v. Reich,* 74 F.3d 1322, 1331–32 & n. 5 (D.C.Cir.1996) (*"Dalton's* holding merely stands for the proposition that when a statute entrusts a discrete specific decision to the President and *contains no limitations on the President's exercise of that authority,* judicial review of an abuse of discretion claim is not available." (emphasis added)).

## II

■ We must consider still another jurisdictional issue. Although the President's actions are subject to judicial review, it does not necessarily follow that a claim for relief may be asserted against the President directly. The Supreme Court has twice held that the APA does not authorize an action directly against the President. In *Franklin v. Massachusetts,* 505 U.S. 788, 112 S.Ct. 2767, 120 L.Ed.2d 636 (1992), the Court held that because the APA's definition of "agency," 5 U.S.C. §§ 701(b)(1), 551(1) (2000), neither explicitly included nor excluded the President, the act should be construed to exclude the President "[o]ut of respect for the separation of powers and the unique constitutional position of the President." *Franklin,* 505 U.S. at 800, 112 S.Ct. 2767. Likewise, the Court in *Dalton v. Specter,* 511 U.S. 462, 114 S.Ct. 1719, 128 L.Ed.2d 497 (1994), held that "actions of the President cannot be reviewed under the APA because the President is not an 'agency' under that Act." *Id.* at 476, 114 S.Ct. 1719. This reasoning seems equally applicable to actions under 28 U.S.C. § 1581(i), which refers only to actions "against the United States, its agencies, or its officers" and does not specifically include the President. We conclude that section 1581(i) does not authorize proceedings directly against the President.[5]

Since the complaint in this action relied solely on section 1581 as the source of jurisdiction, the President should have been dismissed as a party.[6] Relief could

---

5. The dissent cites language in our decision in *Humane Society of the United States v. Clinton,* 236 F.3d 1320 (Fed.Cir.2001), *post* at 6–8, for the proposition that § 1581(i) authorizes suits against the President. This case, however, dealt only with the general issue of the government's sovereign immunity and not with the applicability of § 1581(i) to the President individually.

6. Given the complaint here, we need not decide whether the President would be subject to a non-statutory review proceeding in view of the Supreme Court's decision in *Mississippi v. Johnson,* 71 U.S. 4 Wall. 475, 18 L.Ed. 437 (1866). *See generally* Richard H. Fallon, Jr. *et al., Hart & Wechsler's The Federal Courts and the Federal System* 1137–40 (5th ed.2003); *Franklin,* 505 U.S. at 823–29, 112 S.Ct. 2767

still be sought against Robert C. Bonner, then the Commissioner of the United States Customs Service (which is now the United States Bureau of Customs and Border Protection), who was also named as a defendant. He could be barred from enforcing the duties if the imposition of those duties by the President was determined to be beyond his authority. *See Chamber of Commerce*, 74 F.3d at 1327 (explaining that the fact that "the Secretary[ ] [of Labor's] regulations are based on the President's Executive Order hardly seems to insulate them from judicial review under the APA, even if the validity of the Order were thereby drawn into question").

In summary, we conclude that the Court of International Trade had jurisdiction over this case, except that the President should have been dismissed as a party. We, therefore, have jurisdiction over the merits of this appeal pursuant to 28 U.S.C. § 1295(a)(5), except with respect to the President.

## III

█ In reviewing the grant of summary judgment on the administrative record, we reapply the standard of review that the Court of International Trade applied. *Alloy Piping Prods., Inc. v. Kanzen Tetsu Sdn. Bhd.*, 334 F.3d 1284, 1289 (Fed.Cir. 2003). We announced the standard of review for decisions of the Commission and the President under the escape clause provision of the Trade Act of 1974 as articulated in *Maple Leaf*. 762 F.2d at 89.

The appellants' first contention on the merits is that the Commission determination was not a 3–3 tie as to tin-mill products as the Commission reported it to be. The Commission reported as follows:

> Chairman Koplan, Vice Chairman Okun, and Commissioner Hillman determine that carbon and alloy tin mill products

are not being imported into the United States in such increased quantities as to be a substantial cause of serious injury to the domestic industry; Commissioners Bragg, Miller, and Devaney make an affirmative determination regarding imports of carbon and alloy tin mill products.

Determination, slip op. at 25. By statute, if "the commissioners voting are equally divided with respect to [a] determination, then the determination agreed upon by either group of commissioners may be considered by the President as the determination of the Commission." 19 U.S.C. § 1330(d) (2000). Under the escape clause provision, the President has authority to impose a duty only if the Commission makes "an affirmative finding regarding serious injury." 19 U.S.C. § 2253(a)(1)(A) (2000). Therefore, the President's action was lawful only if the Commission was evenly divided. No party contests our authority to review whether the Commission determination was a tie vote. *See, e.g., Voss Int'l Corp. v. United States*, 67 C.C.P.A. 96, 628 F.2d 1328, 1332–33 (1980) (analyzing whether a 2–2 vote could constitute an affirmative determination where two members failed to vote). The appellants contend that Commissioners Bragg and Devaney's votes cannot be counted as affirmative injury determinations as to tin mill products because they did not analyze tin mill products as a separate category. Therefore, appellants argue, the Commission's vote should properly have been reported to the President as a 3–1 determination of no serious injury. There is no merit to this argument.

Commissioners Bragg and Devaney each specifically voted affirmatively with regard to tin mill products. On October 22, 2001, the commissioners recorded their votes at a public hearing. Commissioner Devaney

(Scalia, J., concurring in part and concurring   in the judgment).

voted as follows: "I find one domestic industry producing all flat products. In this investigation, I am voting in the affirmative with respect to slab, plate, hot-rolled products, cold-rolled products, GOES, corrosion-resistant products, *and tin mill products.*" App. at 297 (emphasis added). Commissioner Bragg voted as follows:

> In this investigation, I find that there are 13 domestic like products and 13 corresponding domestic industries. I find domestic like product number one includes carbon and alloy flat products consisting of slabs, cut-to-length plate, hot-rolled, cold-rolled, grain-oriented electrical steel, coated products, *and tin mill products.* I vote in the affirmative with respect to domestic like product number one.

App. at 303 (emphasis added). Moreover, neither commissioner objected when the Commission tallied their votes as affirmative with regard to tin mill products. The Commission tallied three votes, Commissioners Devaney, Bragg, and Miller, as affirmative with regard to tin mill products. It is, therefore, clear that Commissioners Bragg and Devaney intended their votes with regard to tin mill products to be affirmative. Having reached this conclusion, we are not "compelled ... to probe the mental processes" of the commissioners any further to determine whether their votes were properly counted as affirmative despite those commissioners' different underlying reasoning. *Voss,* 628 F.2d at

1332 (holding that the Commission properly recorded a non-voting commissioner's vote as an abstention rather than as a dissent); *cf. Pub. Serv. Comm'n v. Fed. Power Comm'n,* 543 F.2d 757, 777 (D.C.Cir.1974) (holding that "in each instance, what counted in the definition of agency action was the vote rather than the individual view" of each member of the Federal Power Commission). Accordingly, the Commission did not err in counting the votes as to tin mill products as a 3–3 tie.

## IV

■ The more difficult question is whether the Commission determination must be set aside because the Commission failed to adequately explain the basis for the decision of the three commissioners who found serious injury with respect to tin mill products.[7] The statutory standard for that analysis here is not the traditional APA standard of review. *See* 19 U.S.C. § 1516a(b)(1) (2000). Instead, as we held in *Maple Leaf,* under the escape clause provision of the Trade Act of 1974, "[f]or a court to interpose, there has to be a clear misconstruction of the governing statute, a significant procedural violation, or action outside delegated authority. On the other hand, the President's findings of fact and the motivations for his action are not subject to review." 762 F.2d at 89 (citation omitted). We must, therefore, examine the pertinent statute.

7. The government and the private interveners contend that this issue was not raised before the Court of International Trade. Under *Novosteel SA v. United States,* 284 F.3d 1261 (Fed.Cir.2002), the failure to raise an issue properly below precludes our review of the issue. *Id.* at 1273–74. While it is a close case, we conclude that the issue was properly raised in the appellants' complaint and in their opposition to the government's motion to dismiss. *See* Compl. ¶9 ("These two Commissioners offered no injury or causation

analysis specific to tin mill...."); Opp'n To Mot. to Dismiss at 19 ("Under Section 201, a Commissioner's decision on a much more broadly-defined product—indeed, on any product category other than tin mill products—does nothing to meet the requirements for the Commission's decisions on whether the U.S. tin mill products industry has been seriously injured...."). We note also that the Court of International Trade specifically addressed this issue, as described above.

The statute requires that "the Commission shall submit to the President a report on each investigation undertaken...." 19 U.S.C. § 2252(f)(1) (2000). Subsection 2252(f) provides in detail what the Commission report must contain. *Id.* § 2252(f)(2). The Commission report must provide "an explanation of the basis for each recommendation" to the President, *id.* § 2252(f)(2)(B), and must include the findings required by subsection 2252(c)(2), *Id.* § 2252(f)(2)(D). Section 2252(c)(2) requires the commissioners to "consider the condition of the domestic industry over the course of the relevant business cycle" and "to examine factors other than imports which may be a cause of serious injury, or threat of serious injury, to the domestic industry." *Id.* § 2252(c)(2). The statute requires that the commissioners' reports contain "[a] description of ... the short and long-term effects that implementation of the action recommended ... is likely to have," and "the short and long-term effects of not taking the recommended action." *Id.* § 2252(f)(2)(G).

The majority opinion in *Maple Leaf* did not address these statutory provisions or delineate what kind of explanation the statute requires from the Commission. The government candidly urges that the statute does not require any rational explanation from the Commission concerning its determinations of serious injury. Once the commissioners have voted, says the

government, the inquiry is at an end, even if the statutory report is "totally inconsistent" or "completely irrational."[8] We cannot agree that the statute was designed to leave the Commission so completely unfettered by normal requirements of administrative law. *Cf. SKF USA, Inc. v. United States*, 263 F.3d 1369, 1382 (Fed.Cir.2001) (stating that Commerce must provide an explanation for its failure to interpret identical statutory terms consistently).

In a concurring opinion in *Maple Leaf*, Judge Cowen concluded that "[b]efore the [Commission] can be deemed to have complied with this statute, it is ... necessary ... that its Report fairly apprise the President, interested parties, and the public of the reasoning underlying its recommendation." *Maple Leaf*, 762 F.2d at 90 (Cowen, J., concurring) (citation omitted). We have not had occasion since *Maple Leaf* to determine whether Judge Cowen's view was correct. We now hold that it was because the statute specifically requires that the commissioners provide an explanation. In requiring an explanation the statute implicitly requires that the report to the President provide an internally *consistent* explanation for the conclusions reached.

The legislative history of this provision confirms this requirement. The commissioners' report was "to present the facts and in a manner which will render the report useful to the President." H.R.Rep.

---

8. The following exchanges occurred at oral argument:

THE COURT: So you're basically saying that all that's necessary under *Maple Leaf* and under the statute is if she casts the vote, that's it? It doesn't make any difference how totally inconsistent she is with the majority or how contrary she is to the majority? Is the answer to that yes? All we look at is the vote?
COUNSEL FOR THE ITC: Well, under *Maple Leaf*, the standard for whether or not what [the commissioners] put in is sufficient is very

low and it seems unclear. But yes, my answer is yes.
* * *
COUNSEL FOR THE PRESIDENT: I do recall a provision of the statute that requires some sort of explanation, so if there were just a series of votes and no explanation at all, one could fairly argue that the Commission has not followed the statutory provision.
THE COURT: So you read the statute as saying there has to be an explanation, but it can be completely irrational?
COUNSEL FOR THE PRESIDENT: Yes.

No. 91–1435, at 31 (1970). And the Senate Finance Committee "fe[lt] strongly that the Commission ought to reach a clear, definitive majority view on the nature of the remedy that is most suitable to the injury found." S.Rep. No. 93–1298, at 123 (1974).

## V

Our decisions establish that in reviewing a Commission determination, each of the various separate opinions making up the majority decision is subject to judicial scrutiny under the applicable statutory standard. *Angus Chem. Co. v. United States,* 140 F.3d 1478, 1485–86 (Fed.Cir. 1998) (reviewing each commissioner's opinion separately); *U.S. Steel Group v. United States,* 96 F.3d 1352, 1362–65 (Fed.Cir. 1996) (reviewing each commissioner's opinion separately). If any opinion necessary to the majority, or in this case the three-vote plurality, fails to satisfy the statutory standard, the decision must be set aside. For example, in *United States Steel Group,* the court found that two of the commissioner's opinions were based, in part, on erroneous findings, and, therefore, the court had to exclude those findings in determining whether those commissioners' opinions were based on substantial evidence. 96 F.3d at 1363.

■ However, under our decision in *United States Steel Group,* it is not necessary that separate opinions comprising a majority (or here a plurality), agreeing on a single result, adopt identical or even consistent reasoning in reaching that particular result. In that case, the appellants challenged the Commission's determination that domestic industry was not injured by the importation of hot and cold-rolled steel, contending that two of the commissioners who constituted the majority adopted different tests from the other commissioners to determine material injury—a "one-step test" rather than a "two-

step test." *Id.* We rejected the appellants' argument (there under the APA) that the commissioners composing a majority must employ a single methodology. We determined that "[t]he statute on its face compels no such uniform methodology, and we are not persuaded that we should create one, even were we so empowered." *Id.* at 1362. We then observed the complexity of factors that Congress had directed the commissioners to consider in determining material injury, and concluded, "[t]he invitation to employ such diversity in methodologies is inherent in the statutes themselves, given the variety of the considerations to be undertaken and the lack of any Congressionally mandated procedure or methodology for assessment of the statutory tests." *Id.* Hence, "[s]o long as the Commission's analysis does not violate any statute and is not otherwise arbitrary and capricious," *id.,* the various commissioners composing a majority need not rely on identical or consistent methodologies in explaining their conclusions. *Accord Angus,* 140 F.3d at 1484. Thus, here the three-member plurality of the Commission agreed that both the articles included in the broader category of carbon and alloy products and in the narrower category of tin mill products caused serious injury. Commissioner Miller treated the two categories separately. Commissioners Bragg and Devaney treated them together. This inconsistency is not a ground for setting aside the decision.

## VI

Nonetheless, it is necessary that each commissioner's separate opinion be *internally* consistent, and that each opinion adequately explain the commissioner's vote. Here the appellants argue that the opinions of Commissioners Bragg and Devaney also do not satisfy that requirement. On the one hand these commis-

sioners reasoned that tin mill is not a separate category. This view was rejected by a majority of the Commission. Yet, these two Commissioners voted to treat the import of tin mill as a cause of serious injury. Appellants argue that the reasoning of Commissioners Bragg and Devaney (analyzing tin mill as part of a larger category) and their votes (treating tin mill separately) are not consistent and that this inconsistency is potentially significant. Appellants point out that tin mill products comprise only a small percent of the total larger domestic industry. (Appellants' Br. at 40 (stating that "tin mill products represent only 1.7 percent of total flat-rolled product consumption and 2.7 percent of total flat-rolled imports")). Thus, it does not necessarily follow that because the importation of all carbon and alloy flat products causes serious injury to the domestic market, the importation of tin mill products, standing alone, would cause serious injury.

But we think the claimed inconsistency in the opinions of Commissioners Bragg and Devaney is more theoretical than real. They simply voted to treat tin mill as part of a larger category and viewed their votes as to serious injury as a reaffirmation of this position. It is not immediately apparent here that finding that articles A and B combined (here carbon and alloy products and tin mill combined) causes serious injury has different consequences than finding that articles A and B treated separately cause serious injury. To be sure, it is possible that there would be different consequences from a combined finding of serious injury with respect to carbon and alloy products including tin mill than separate findings as to tin mill and other carbon and alloy products, in which event the reasoning of Commissioners Bragg and Devaney might be at variance with their votes. But appellants have not argued that point here. We decline to speculate as to whether such

a showing, if made, would invalidate the President's order.

In short, we conclude that appellants have failed to establish that the opinions of Commissioners Bragg and Devaney do not provide adequate explanation or are internally inconsistent.

## CONCLUSION

For the foregoing reasons, the appeal with respect to the President is dismissed. In all other respects the decision of the Court of International Trade is affirmed.

*DISMISSED IN PART; AFFIRMED IN PART*

## COSTS

No costs.

PAULINE NEWMAN, Circuit Judge, concurring in the judgment, dissenting in part.

This action arose upon a request by the United States Special Trade Representative, for investigation concerning whether certain imports of tin mill steel were being imported in such increased quantities as to be a substantial cause of serious injury, or the threat thereof, to the domestic industry. The request initiated a complex proceeding whereby the members of the International Trade Commission, after conducting an investigation, issued several reports and recommendations to the President of the United States. The President is required by statute to take "all action within his power which the President determines will facilitate efforts by the domestic industry to make a positive adjustment to import competition," 19 U.S.C. § 2251(a), and assigns to the President the authority to take any or all of ten enumerated actions, as set forth in 19 U.S.C. § 2253(a)(3)(1). Such actions include the levying of increased customs

duties, 19 U.S.C. § 2252(f)(2)(A), which are then collected by the Commissioner of Customs.

The Corus group of companies was the subject of such an investigation and presidential levy. In appealing to the Court of International Trade, as the statute authorizes, Corus named as defendants the International Trade Commission, the President, the Commissioner of Customs, and several domestic steel companies. Corus states that the President exceeded his authority. My colleagues on this panel hold, *sua sponte*, that the President cannot be named as a defendant. That is incorrect, for the President has a direct role in the administration of this statute. His role is not one of executive privilege, but of statutory actor. In that role, the President is as subject to process as any other executive whose ruling is subject to challenge by judicial process. The President, routinely appearing through counsel, has not argued otherwise.

Neither the President nor the International Trade Commission nor the Court of International Trade nor any party suggested that the President was not a proper party to this action. No one requested his dismissal. The position gratuitously taken by this court is extraordinary, and incorrect. Thus I write to state my concern about this ruling of Presidential immunity for actions taken under the Tariff Act.

I agree with the court that the judgment of the Court of International Trade, affirming the Commission, should be affirmed. My concern is with this court's conclusion that "the President should have been dismissed as a party," upon which my colleagues *sua sponte* dismiss the President from the case.

Long-standing precedent distinguishes challenges to the President's actions of policy and political discretion from challenges to ministerial actions of the President as provided by statute, starting with

*Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 2 L.Ed. 60 (1803), where the Court explained that whether an executive act is subject to judicial examination depends on the nature of the act being examined. The Court observed that just as the protection of the law was available against the King, so it is available against the President, depending on the act whose legality is questioned. The Court explained that when the President exercises the political power of the office, that is a matter of discretion in which he "is accountable to his country only in his political character and to his conscience."

In contrast, when the President performs legislatively imposed acts, and when those acts impact the rights of individuals, he is an officer of the law, and responsible as is any other official:

> The conclusion from this reasoning is, that where the heads of departments are the political or confidential agents of the executive, merely to execute the will of the President, or rather to act in cases in which the executive possesses a constitutional or legal discretion, nothing can be more perfectly clear than that their acts are only politically examinable. But where a specific duty is assigned by law, and individual rights depend upon the performance of that duty, it seems equally clear that the individual who considers himself injured, has a right to resort to the laws of his country for a remedy.

*Marbury*, 5 U.S. at 166. Although it has been debated in a variety of contexts whether the President is immune from all legal process, the principle is well established that "with all its defects, delays, and inconveniences, men have discovered no technique for long preserving free government except that the Executive be under the law, . . . ." *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 655, 72 S.Ct.

863, 96 L.Ed. 1153 (1952) (Jackson, J., concurring).

The panel majority, in its insistence that the President cannot be sued, departs from precedent elaborated since *United States v. Burr*, 25 F. Cas. 30 (C.C.D.Va. 1807) (No. 14,692d). I need not repeat this jurisprudence, summarized, for example, in *United States v. Nixon*, 418 U.S. 683, 94 S.Ct. 3090, 41 L.Ed.2d 1039 (1974), for the case now before us is much simpler. This is not a political question, *see Baker v. Carr*, 369 U.S. 186, 217, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962), and raises no issue of national security or executive confidentiality. It is a matter of statutory assignment. In this case the statute assigns a substantive duty to the President—a duty that the President performed in accordance with the assignment, and that was directed to this appellant's property and trade. The President has not disputed his amenability as a party to judicial review; the panel majority's spontaneous ruling that he is outside the court's jurisdiction is contrary to precedent, contrary to constitutional principle, and contrary to statute.

In administering the Trade Act of 1974, 19 U.S.C. § 2101 *et seq.*, the President is not simply a figurehead symbol of state. The President is required by statute to make a substantive decision of commercial consequence. The issue is not whether the President can be brought to account in judicial proceedings, but whether the President acted within his statutory authority, in conformity with the statutory assignment. *See Florsheim Shoe Co. v. United States*, 744 F.2d 787, 795 (Fed.Cir.1984) ("Both Supreme Court and Court of Customs and Patent Appeals precedent have established that the Executive's decisions in the sphere of international trade are reviewable only to determine whether the President's action falls within his delegated authority, whether the statutory language has been properly construed, and whether the President's action conforms

with the relevant procedural requirements."); *United States Cane Sugar Refiners' Association v. Block*, 69 C.C.P.A. 172, 683 F.2d 399, 402 (1982) ("The dispositive issue is whether the President acted within his delegated authority in issuing Proclamation 4941.").

Thus when the statute granting presidential authority places limits on the exercise of that authority, courts may review whether the President has observed those limits. *See Florsheim Shoe*, 744 F.2d at 795 (review of "whether the statutory language has been properly construed"). This court reexamined these issues in *Maple Leaf Fish Co. v. United States*, 762 F.2d 86 (Fed.Cir.1985), and explained that the statute vests broad discretionary authority in the President, reiterated that "the President's findings of fact and the motivations for his action are not subject to review," quoting *Florsheim*, 744 F.2d at 795, but also confirmed that the court may review whether there was "a clear misconstruction of the governing statute, a significant procedural violation, or action outside delegated authority." *Maple Leaf*, 762 F.2d at 89. The panel majority errs in ruling that only the implementing agency (through the Commissioner of Customs) can be subjected to judicial process if the President's actions warrant judicial correction.

Other circuits are in accord. For example, the District of Columbia Circuit, in a case challenging a series of proclamations issued by President Clinton pursuant to the American Antiquities Preservation Act, 16 U.S.C. § 431, which authorizes the President to declare as national monuments "objects of historic or scientific interest that are situated upon the lands owned or controlled by the Government of the United States," discussed the question of presidential authority. In *Mountain States Legal Foundation v. Bush*, 306 F.3d

1132, 1136 (D.C.Cir.2002) the court explained:

> Courts remain obligated to determine whether statutory restrictions have been violated. In reviewing challenges under the Antiquities Act, the Supreme Court has indicated generally that review is available to ensure that the Proclamations are consistent with constitutional principles and that the President has not exceeded his statutory authority.

The court found no jurisdictional infirmity in permitting the plaintiff to challenge the President's actions and seek relief directly from the President. *See also Sneaker Circus, Inc., v. Carter*, 566 F.2d 396, 402 (2d Cir.1977) (explaining that the court is not reviewing the substance of the trade agreements, which are within presidential discretion, but reviews the statutorily mandated procedures by which these agreements were made).

Again, the D.C. Circuit held that it had jurisdiction when the National Treasury Employees Union sued President Nixon over a pay raise mandated by Congress. In *National Treasury Employees Union v. Nixon*, 492 F.2d 587, 616 (D.C.Cir.1974) the court "concludes that in this case the constitutional principles enunciated by Mr. Chief Justice Marshall in *Marbury v. Madison* as to the Secretary of State are equally applicable to the President and holds that jurisdiction in this case exists pursuant to 28 U.S.C. § 1361 to support the issuance of a writ of mandamus directing the President to effectuate the pay raise sought by plaintiff as of October, 1972."

Cases before the Court of International Trade, naming the President as a defendant, have been decided by that court and reviewed by us with no jurisdictional impediment or immunity such as the panel majority now announces. In *Humane Society of the United States v. Clinton*, 44 F.Supp.2d 260 (Ct. Int'l Tr.1999) the plaintiffs sought a writ of mandamus directing President Clinton to impose sanctions on Italy for violation of the Driftnet Fishing Act, 16 U.S.C. § 1826. The Court of International Trade refused to issue the writ, not because it lacked jurisdiction of the President, but because the extent of the discretion granted to the President by the statute precluded mandamus relief. This court affirmed on the same ground, stating: "We conclude that the trial court was correct when it held that the question of whether consultations were 'satisfactorily concluded,' and thus whether the requirement for import sanctions was triggered, is a matter that lies within the broad discretion of the President." *Humane Society of the United States v. Clinton*, 236 F.3d 1320, 1330 (Fed.Cir.2001).

Similarly in *Arjay Assocs., Inc. v. Reagan*, 707 F.Supp. 1346 (Ct. Int'l Tr.1989), the plaintiffs sued the President to challenge an import ban on products manufactured by Toshiba Machine Co., as directed by § 2443 of the Omnibus Trade and Competitiveness Act of 1988. The Court of International Trade dismissed the suit, not because it lacked jurisdiction of the President, but because the plaintiffs did not have standing to bring it. We affirmed on that basis, *Arjay Assocs., Inc. v. Bush*, 891 F.2d 894 (Fed.Cir.1989), stating that "appellants have not even a colorable right to the continued importation of the excluded TMC products, and thus no standing to challenge either the exclusion set forth in section 2443 or the constitutionality thereof." *Id.* at 898.

None of these cases held that the "President should have been dismissed as a party," as the panel majority now holds. Maj. op. at 1360. The panel majority cites *Franklin v. Massachusetts*, 505 U.S. 788, 112 S.Ct. 2767, 120 L.Ed.2d 636 (1992) and *Dalton v. Specter*, 511 U.S. 462, 114 S.Ct. 1719, 128 L.Ed.2d 497 (1994) for the prop-

osition that "actions of the President cannot be reviewed under the Administrative Procedure Act because the President is not an 'agency' under that Act." Maj. op. at 1360. However, as the majority recognizes, the case before us is not under the APA, which authorizes judicial review of "final agency action for which there is no other adequate remedy in a court," 5 U.S.C. § 704, but under 28 U.S.C. § 1581(i), which authorizes suits against the "United States, its agencies, or its officers." There is no support for the panel majority's position that 28 U.S.C. § 1581(i) does not permit proceeding against the President in this statutory role.

A similar argument was raised and resolved in the *Humane Society* cases. *See Humane Society v. Clinton,* 44 F.Supp.2d at 267 ("Despite case law holding the President is not an agency within the meaning of the APA, he continues to be an officer of the United States, and thus is subject to being sued in this Court under section 1581(i).") (citing *Clinton v. Jones,* 520 U.S. 681, 699 n. 29, 117 S.Ct. 1636, 137 L.Ed.2d 945 (1997)). The Federal Circuit in *Humane Society v. Clinton* stated:

> We note in passing that the Government, having assumed that § 1581 does not constitute a waiver of sovereign immunity, looks instead in its brief to this court to § 702 of the APA for the requisite waiver. That leads the Government into extensive consideration of standing under the APA. We need not go there; neither party raises the standing issue independently of the APA issue, and since we do not rely on the APA for its waiver of sovereign immunity, questions of standing under the APA are not before us.

236 F.3d at 1328.

The issues of this suit are not matters of executive privilege or sensitivity; they are matters of statutory authority and obligation that are assigned to the President.

By statute the President selects the remedy to "facilitate efforts by the domestic industry to make a positive adjustment to import competition," 19 U.S.C. § 2253(a)(1)(A), and persons aggrieved by the President's ruling have the right to judicial relief. Upon exercising this statutory authority, no precedent negates the President's right to defend his decision if it is challenged in court. The President routinely so recognized, for he appeared through counsel, filed a brief, and presented argument.

The enforcement of the President's action is by the Customs officials who levy the tariff. Again, there is no hint under § 1581(i) that only the President's minions can be sued. The President does not seek to be immune from judicial review; it is surely irregular for this court to place him there. Where the President is simply performing an official duty, the law has been clear since *Marbury v. Madison,* 5 U.S. at 163 ("The very essence of civil liberty certainly consists in the right of every individual to claim the protection of the laws, whenever he receives an injury.")

The petitioner here has invoked the ordinary mechanism for judicial review and judicial correction of legal error, asserting that error was made by the President in the course of exercising his statutory assignment under 19 U.S.C. § 2253. Upon a non-frivolous allegation that the President's action constituted a "clear misconstruction of the governing statute, a significant procedural violation, or action outside delegated authority," *Maple Leaf,* 762 F.2d at 89, no precedent requires that the President is beyond the court's jurisdiction. To the contrary, when an action is delegated to the President by statute, the court may review whether the President acted within his delegated authority, even in the international sphere. *See American Association of Exporters and Importers v.*

*United States,* 751 F.2d 1239, 1247 (Fed. Cir.1985):

> [Section 204 of the Agriculture Act of 1956] is a broad grant of authority to the President in the international field in which congressional delegations are normally given a broad construction. Of course, the President's regulations must pertain to the general subject of the agreements, or else the President (absent another statutory authorization) has invaded a field granted by the Constitution to Congress.

A charge that the President exceeded his statutory authority is raised in this case. The appellants allege that there was no presidential authority to act because there was not a majority decision of the Commission. Appellants' requested relief includes the prayer to "hold unlawful the President's determination to consider the ITC's vote on tin mill products as an affirmative determination by the ITC and his order imposing a 30 percent additional tariff on imports of tin mill products...." The Trade Act of 1974 assigned a direct role to the President in implementing the Act, and the structure of judicial review embraces controversies arising from that implementation. The President is not excluded from this judicial purview, and indeed the President did not request exclusion. I respectfully dissent from the court's distortion of the structure of our government, in creating this new presidential immunity.